### COMSTOCK et al. v. LOPOKOWA.

### SAME v. VOLONINE.

### (Circuit Court, S. D. New York. October 9, 1911.)

1. Injunction (§ 60*)—Actor's Contract—Personal Services for Others—Remedy—Adequate Remedy at Law.

Where defendants, who were Russian dancers of a very high order and possessed of unusual personal attractions, contracted their services to complainants for a specified period in return for a weekly salary, defendants were of such unusual attainments and personal characteristics and of such special value to complainants as to fall with the class of employés whose negative covenants not to enter into the employment of others may be enforced in equity; it not being necessary to such relief that defendants were the stars or only stars of complainants' performances, or that the performances would be brought to a standstill because of their withdrawal.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 117–119; Dec. Dig. § 60.*

Restraining breach of contract of employé not to engage in competing business, see note to Harrison v. Glucose Sugar Refining Co., 53 C. C. A. 492.]

---

2. Contracts (§ 208*)—Construction—Breach.

Defendants, who were Russian dancers, contracted to perform under complainants' direction at first-class theaters in the United States and Canada for regular performances . ("not vaudeville") as complainants might require for the season of 1911–12. *Held*, that the words "not vaudeville" meant that complainants would not require defendants to dance at vaudeville theaters or in vaudeville performances; and hence the mere fact that complainants put on the stage in a regular theater where defendants were performing a vaudeville act by one of the dancers did not make the theater or the performance vaudeville and did not constitute a breach of defendants' contract, authorizing them to terminate the same.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 208.*]

3. Contracts (§ 303*)—Personal Services—Breach.

Where a contract for personal services of theatrical artists provided that they should only be required to perform at first-class theaters for regular performances (not vaudeville), the fact that it was distinctly understood when the contract was made that no vaudeville of any kind was to be interjected into the performances at which defendants were to appear, and that complainants did not comply with such understanding, was insufficient to justify defendants in leaving an unfinished engagement without at least a genuine attempt to have the . vaudeville eliminated and the contract complied with.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 303.*]

In Equity. Bills by F. Ray Comstock and another against Lydia Lopokowa and against Alexander Volonine for preliminary injunction.

Sondheim & Sondheim, for complainants.
Blumenstiel & Blumenstiel, for defendants.

WARD, Circuit Judge. These two cases arise out of the same state of facts and will be disposed of together. They are bills in equity praying for a preliminary, and upon final hearing a permanent, injunction. Restraining orders were issued ex parte, and the motions now to be decided require the defendants to show cause why the restraining orders should not be continued. The complainants are theatrical managers now engaged in representing three Russian ballets called Cleopatra, Les Sylphides, and Scheherazade. The defendants are Russian dancers of a very high order and possessing unusual personal attractions.

The material provisions of the contracts are as follows:

"That the said party of the second part in consideration of the payment to be made her by the party of the first part, at the time and in the manner hereinafter specified and also in consideration of the sum of one dollar to her in hand paid, as an advance on salary (receipt whereof is hereby acknowledged) has engaged and does hereby engage herself to the party of the first part, to perform for the party of the first part, at first class theatres in the United States and Canada, for regular performances (not vaudeville) as the said party of the first part may require for the season of 1911 and 1912, of forty weeks, commencing on or about June fifth.

"And it is further agreed to and understood that the number of performances given each week shall not be more than eight.

"Said party of the first part is to pay said party of the second part for her services as a prima ballerina each and every week for forty weeks, the sum of four hundred ($400) dollars. * * *

"It is also understood between party of the first part and party of the second part, the party of the second part will not appear during the period of this contract, in private or public, without the written consent of the party of the first part."

The defendant Volonine was to receive $300 a week.

The complainants began presenting the Russian ballets about July 11th and booked them for September 17th, 18th, and 19th at Minneapolis. On the morning of the 19th the defendants withdrew from the company, returned to New York, and September 23d entered into engagements with the "Enterprises of Max Rabinoff," a rival organization which was also preparing to produce and is this evening to give Russian ballets at Hartford, Conn.

[1] The first objection to the motion is that the complainants have an adequate remedy at law because the services of the defendants are not unique and can be replaced. But I am satisfied that the defendants are of such unusual attainments and personal characteristics and of such especial value to the complainants as to fall within the class of employés whose negative covenants not to enter into the employment of others may be and should be enforced in equity. It is not a necessary condition of granting such relief that the employés should be the stars or the only stars of the complainant's performances, or that the performances should be brought to a standstill because of their withdrawal.

[2] Next the defendants say that the complainants themselves violated the contracts by interjecting a vaudeville act of Gertrude Hoffman, one of the dancers, between two of the ballets on the evening of September 18th at Minneapolis. I think this was not a violation of the contract. The words "not vaudeville" in parenthesis mean that the complainants cannot require the defendants to dance at vaudeville theaters or in vaudeville performances. There is no allegation that the theater at Minneapolis was a vaudeville theater, nor that the Russian ballets in which the defendants danced were vaudeville performances, nor that the defendants danced in any such performance.

Conceding the act of Miss Hoffman to be a vaudeville act, it did not make the theater nor the whole performance vaudeville.

[3] The defendants, however, submit the affidavit of one Mandelkern, who was managing the defendants at the time the contracts were made, and who drew the contracts, to the effect that before they were signed it was distinctly understood between him and Gest, one of the complainants, that no vaudeville of any kind was to be interjected into the performances at which the defendants were to appear. If this be true, the defendants would be entitled to insist that such practice be discontinued; but they had no right to leave an unfinished engagement without the least genuine attempt to settle this question with the complainants. Non constat but the act complained of would never be introduced again. Even if this required them to continue to dance for a reasonable time under protest, they would not have prejudiced their rights by so doing.

It is true that Mandelkern says he expressed his surprise to Haskell, who was, I understand, road manager, and that he replied that he was surprised, too. But this answer shows what I believe to be the fact

that Haskell had not introduced the act, and indeed had no authority to do so. Something of the same inconclusive kind took place with the complainant's musical manager. The conduct of the defendants was most unreasonable and unfair in any aspect of the case.

Finally, Rabinoff, the president of the rival organization which has employed the defendants, says that Gest, one of the complainants, after negotiations for taking over the complainants' entire organization had fallen through, said that he might employ the defendants, as he (Gest) did not want them and it would be a saying to him. Rabinoff is corroborated in this by Atwater, the secretary, Von Kivaly, the orchestra manager, and Elsen, Jr., the press agent of the company. But this is denied by Gest, by Belasco, his father-in-law, and by Comstock, who were present at some of the interviews, and is inconsistent with the conduct both of the defendants and of the complainants. The defendants at the time justified their withdrawal on account of the complainants' alleged violation of the contracts, while the complainants have always treated this conduct of the defendants as a justiciable breach of their contracts. It is also to be noted that the contracts required the defendants to have the complainants' written consent before engaging with any one else.

Whoever comes into equity must come in with clean hands, and, if the complainants or either of them contributed by their conduct to the making of the contracts performance of which they now seek to enjoin, equity would lend them no aid.

In actions by managers against theatrical artists, relief to be of any avail must generally be given in the first instance because such artists are usually of doubtful financial responsibility, and the season for which they engage is over before the cause can be reached for final hearing. As, on the whole case, I do not feel sufficient doubt to deny relief in the first instance, the restraining orders heretofore given will be continued until the expiration of the terms of the defendants' contracts.

An order may be submitted at 2 p. m.